[Cite as *State v. Swing*, 2017-Ohio-8039.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | | CASE NO. CA2016-10-068 |
| Plaintiff-Appellee, | : | |
| | | O P I N I O N |
| | : | 10/2/2017 |
| - vs - | | |
| | : | |
| JOHN M. SWING, | : | |
| | | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2015 CR 0475


D. Vincent Faris, Clermont County Prosecuting Attorney, Nicholas Horton, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for plaintiff-appellee

Engel & Martin, LLC, Joshua Engel and Mary K. Martin, 5181 Natorp Boulevard, Suite 210, Mason, Ohio 45040, for defendant-appellant


**S. POWELL, P.J.**

{¶ 1} Defendant-appellant, John M. Swing, appeals from his conviction in the Clermont County Court of Common Pleas for three counts of sexual imposition following a jury trial. For the reasons outlined below, we affirm.

**Facts and Procedural History**

{¶ 2} At all times relevant, Swing, who was then 50 years old, was employed as a

sergeant with the Miami Township Police Department ("MTPD"). Swing worked for MTPD for 18 years. The victim in this case, A.H., who was then just 20 years old, was a participant in MTPD's Explorer Program ("Explorer Program"). The Explorer Program is a program for young people who have completed eighth grade ages 14 to 21 who are interested in police work and the possibility of a career in law enforcement. A.H. had been a participant in the Explorer Program for approximately three years prior to the day in question, Thursday, April 16, 2015.

## The Indictment

{¶ 3} On August 27, 2015, the Clermont County Grand Jury returned an indictment charging Swing with three counts of gross sexual imposition in violation of R.C. 2907.05(A)(1), all fourth-degree felonies, and one count of assault in violation of R.C. 2903.13(A), a first-degree misdemeanor. According to the bill of particulars, the charges arose after A.H claimed Swing made numerous sexual comments towards her before spanking and rubbing her buttocks, touching and rubbing her vagina, and wrestling and laying on top of her, smacking her buttocks "while commenting on how nice it looked" on the afternoon of Thursday, April 16, 2015. The bill of particulars alleges this inappropriate touching occurred while at Swing's home and while in Swing's police cruiser during the course of A.H.'s ride along with Swing as part of her involvement with the Explorer Program. Swing entered a not guilty plea to all charges. Swing was subsequently fired from his position as a sergeant with MTPD on September 1, 2015.

## The Jury Trial

{¶ 4} After a number of pre-trial issues were decided, including a motion to suppress the search of Swing's personal cell phone, a motion in limine to exclude so-called "other acts" evidence, as well as a motion to dismiss alleging a *Garrity* violation, among others, the matter proceeded to a 10-day jury trial. During this time, the jury heard from 24 witnesses, including

A.H. The following facts are taken from the testimony and evidence presented at trial.

**The State's Case**

{¶ 5}    On March 25, 2015, A.H. filed a request with Officer Skip Rasfeld, the officer in charge of Explorer Program, to go on a ride along with a MTPD officer on Thursday, April 16, 2015. After moving through the appropriate channels, A.H.'s request to go on a ride along that day was approved.

{¶ 6}    At 11:47 a.m. on the day in question, A.H.'s father, D.H., dropped off A.H. at MTPD for the ride along. According to D.H., nothing about A.H.'s attitude or demeanor appeared unusual at that time. After arriving at MTPD, A.H. went to Swing's office where she and Swing engaged in small talk. Having known Swing for several years, A.H. testified her relationship with Swing was "relaxed," "sarcastic," and that she "felt comfortable around him, trusted him."

{¶ 7}    After talking for approximately ten minutes, Swing told A.H. that she would "just be riding around with him for a little bit that day until an officer was available[.]" Although not prohibited by any MTPD policy at the time, Officer Rasfeld testified that he was unaware of any other occasion where a sergeant had conducted a ride along with a member of the Explorer Program. Detective Matt Davilla also testified that having a sergeant conduct a ride along with a member of the Explorer Program was "not normal." Nevertheless, A.H. testified that she was fine with accompanying Swing on the ride along because she and Swing would oftentimes joke with each other and she liked him. Surveillance video indicates A.H. and Swing left MTPD at 11:55 a.m. to begin the ride along.

{¶ 8}    Approximately an hour later, at 12:58 p.m., Swing and A.H. were dispatched to a residence for a wellness check on an elderly woman who was not answering her phone. Upon making their way to the residence, A.H. testified that Swing "made comments about wrestling" and "how he can take me down." Thereafter, once they determined that the

- 3 -

elderly woman was fine, which A.H. testified took only a few minutes, Swing and A.H. left the residence. Dispatch records indicate Swing and A.H. left the residence at 1:14 p.m. A.H. then testified:

> When we were leaving, I remember Swing just kind of nudging me, and – with his elbow saying, you know, like I could take you in a – in a fight or whatever. We got back to his car and he said – he mentioned like, [d]o you still want to come to my house? And I just – I was like, whatever. Sure. I had gone to many other officers' houses before for babysitting, or if they had to check up on their dog. So, I didn't think anything of it. I mean, he was a sergeant.

When asked, Assistant Chief Mike Mills testified that Swing's decision to take A.H. to his home while he was on duty and nobody else was present was inappropriate, although not prohibited by any MTPD policy at the time.

{¶ 9} After arriving at Swing's house, A.H. testified that Swing offered her a bottle of water and then continued talking about "wrestling, like I could take you." In response, A.H. testified she jokingly "did a little ninja pose[.]" To this, A.H. testified Swing opened his basement door and motioned for A.H. to follow him downstairs. Not thinking anything of it, A.H. testified that she went downstairs to Swing's basement. According to A.H., she believed Swing was going to show her some of his awards and commendations that he kept in his basement, an area Swing referred to as his "shrine." Once downstairs, A.H. testified Swing took off his duty belt and laid it over a chair. To this, A.H. testified that she "knew something was up then, because I've never seen an officer take off their duty belt."

{¶ 10} Continuing, A.H. testified that Swing then approached her, grabbed her by the arm, and "before I knew it, I was on the ground, and he was on top of me." After being taken to the ground, A.H. testified she froze and told Swing several times that she could not breathe. Describing the incident further, A.H. testified that Swing overpowered her, which made her feel uncomfortable "because his face was really close to mine. As if, I kind of got

the impression that he was going to kiss me," thus prompting A.H. to turn her head. A.H. then testified Swing flipped her over on her stomach and "started making comments about [her] butt" before spanking her on the buttocks.

{¶ 11} Upon being spanked, A.H. testified that she "froze. I didn't know what to do. I felt really uncomfortable." Believing the "wrestling" was over, A.H. testified she and Swing then got up from the floor. The "wrestling" was not over, however, for A.H. testified Swing then pinned her to the couch and held her hands behind her back. According to A.H., Swing urged her to "[t]ry to fight back," but that she was unable to free herself from Swing's grasp. A short time later, after still more "wrestling," Swing got up and told A.H. to fix her uniform. Swing then put his duty belt back on. Swing and A.H. then exited the basement and went to Swing's backyard to look at the bridge Swing was building over the creek on his property. During this time, A.H. testified that "I just – was like, [w]hat just happened? Like, [w]hat is going on? Like, [t]his is kind of weird." A.H. also testified that her "mind [was] racing" and that she thought to herself "[t]his isn't right. You need to do – like I was just, [A.H.], you need to like do something, but I just couldn't."

{¶ 12} After looking at the bridge, Swing and A.H. went back to Swing's cruiser and left the property. Once in the cruiser, A.H. testified that she got out her phone and began text messaging her friend A.S., another member of the Explorer Program. As A.H. testified, "I was texting [A.S.] like, you know, what had happened as fast as I could." According to A.H., she was scared and "just didn't know what was going on" at the time. A.H. further testified that she felt "frozen" and "alone" after leaving Swing's house. As A.H. later testified, although she was unable to make any phone calls, she had been "sneaking a few messages, blasting messages" to A.S. during the ride along with Swing. The text messages, which the trial court admitted into evidence as excited utterances, stated, in pertinent part, the following:

[A.H.] (1:46 P.M.) Hey I need to talk to u

[A.H.] (1:58 P.M.) I'm serious

[A.H.] (2:24 P.M.) An officer took me to his house and we stared wrestling I didn't know what to do!? [A.S.] I'm not kidding u swear to god

Shortly thereafter, A.H. and A.S. engaged in the following exchange:

[A.H.] (2:34 P.M.) Swing touched my vagina

[A.S.] (2:38: P.M.) What

[A.H.] (2:38 P.M.) [A.S.] I really need to talk to u

[A.S.] (2:38 P.M.) Call me

[A.S.] (2:41 P.M.) Hello

[A.H.] (3:29 P.M.) I can't

[A.H.] (3:29 P.M.) I'm on a ride along

[A.H.] (3:29 P.M.) Still and idk what to do

{¶ 13} A.H. then asked A.S. to pick her up from MTPD after her ride along with Swing was over, to which A.S. agreed. The text messages between A.H. and A.S continued with the following exchange:

[A.H.] (3:32 P.M.) He keeps touching me [A.S.] I'm not lying

[A.S.] (3:32 P.M.) Who??

[A.H.] (3:33 P.M.) Swing!

[A.H.] (3:33 P.M.) John Swing

[A.S.] (3:33 P.M.) Are you riding with him

[A.H.] (3:33 P.M.) Yes

[A.H.] (3:33 P.M.) I just want it to be over

[A.S.] (3:33 P.M.) This is crazy omg

[A.H.] (3:34 P.M.) I want to cry

[A.S.]  (3:34 P.M.)  Tell him you need to go then

[A.H.]  (3:34 P.M.)  Idk how

[A.H.]  (3:34 P.M.)  Idk what to do

[A.H.]  (3:34 P.M.)  Like this has never happened

[A.S.]  (3:35 P.M.)  Just say your mom texted you and that you need to get home or something

[A.H.]  (3:35 P.M.)  Ugh

[A.H.]  (3:45 P.M.)  [A.S.]

[A.S.]  (3:45 P.M.)  Yea

[A.H.]  (3:46 P.M.)  I feel awful

[A.H.]  (3:46 P.M.)  Like I feel sick

[A.H.]  (3:46 P.M.)  I never thought this would happen

[A.H.]  (3:47 P.M.)  And idk what to do

[A.S.]  (3:48 P.M.)  You should leave

[A.H.]  (3:51 P.M.)  Idk how

[A.H.]  (4:08 P.M.)  I'm going to cry when I see u in not going to lie

[A.S.]  (4:08 P.M.)  Well it's ok if you cry

Continuing with her testimony, A.H. testified:

[A.H.]:  The rest of the day was just kind of – it was – I Just didn't know what was going on.  I – after we left his house, we did not go on – we did not go on a lot of calls that day, which was bizarre.  We ran some radar.  We went back to the police department.  And I remember on the way there I think we were at a stop sign.  And that's when he like put his hand on my leg.  And then he kept asking me like, are you nervous?  Do I make you nervous?  And I was just –

[THE STATE]:  Were you nervous?

[A.H.]:  I was.  I was just thinking about how to get through this day without upsetting him.  I just was trying to think how to keep

- 7 -

myself safe. So, he like moved his arm slowly up my leg. And then like with his – like his—I just remember his fingers, like they touched my like vagina.

{¶ 14} After Swing touched her vagina, A.H. testified she told Swing to stop and informed Swing that him touching her made her nervous. To this, A.H. testified Swing moved his arm away and stated "I thought so," before heading back to MTPD. When describing her demeanor upon returning to the MTPD, A.H. testified she was "really upset. And I just couldn't find it in myself to say, help me. He just did this to me. Like, I was in shock." A.H. further testified that, although she had the opportunity to do so, "I didn't say anything [to either of the two officers she had contact with while at the MTPD], and I wish I had." When asked why she did not tell anybody about Swing's conduct that day when given the opportunity, A.H. testified that she was "really scared," very upset, and in shock, and "didn't think anyone would believe [her]."

{¶ 15} Upon leaving MTPD to continue the ride along, A.H. testified Swing began making derogatory and inappropriate comments about some of the other officer's wives, "like talking about their breasts and everything." Swing then drove A.H. to the Kelly Nature Preserve, a park known as a place where men go to engage in homosexual activity. Once there, A.H. testified Swing made further derogatory comments about homosexual men. In response, A.H. testified she became even more upset because she had a lot of homosexual friends so she "just drank and chugged water that day." Due to the amount of water she consumed, A.H. testified she had Swing stop at a hotel so that she could use the restroom. Surveillance video indicates A.H. entered the hotel at 4:29 p.m. Describing her time at the hotel, A.H. testified:

> So we went to the Hilton Garden where I used the restroom. And I didn't bring my phone with me, because he wanted me to keep the phone in his car. When I went in, I did pass people where I could have easily been like, help me. Like, I'm being assaulted. I – I've just been assaulted. Like, I just – I went to the

bathroom. And I just remember tell – what do I do? Like I had no clue what to do in this situation. I just felt so alone.

{¶ 16} Returning to the cruiser, A.H. testified she and Swing "drove around" and "ran some radar." A.H. then testified Swing made some additional comments about wanting to go back to his house, to which A.H. declined by stating she would rather just run radar and use the radar gun. Sometime later, when the ride along was about to conclude, A.H. testified that Swing told her "[y]ou can't tell anyone about this. You know, no one will believe you if you do tell." A.H. testified Swing then offered to buy her clothes. A.H. refused Swing's offer. A.H. also testified that Swing told her he was going "to finish [her] off" at her apartment the next day, and that he would call her. According to A.H., throughout the ride along, Swing touched her vagina only once, but that he touched her leg and thigh multiple times. Specifically, A.H. testified:

[THE STATE]: Did he touch or spank your butt in his basement?

[A.H.]: Yes.

[THE STATE]: Did he touch your thigh in his car?

[A.H.]: Yes.

[THE STATE]: Did he do that more than one time?

[A.H.]: Yes.

[THE STATE]: Did he touch your vagina in his car?

[A.H.]: Yes.

[THE STATE]: Did he do that more than one time?

[A.H.]: He only did that one time.

[THE STATE]: Did that occur in his cruiser?

[A.H.]: Yes.

{¶ 17} At approximately 6:00 p.m., A.S. picked up A.H. from MTPD. However, instead

of leaving immediately, A.H. and A.S. went to talk to Swing "because [Swing] wanted to say hi to [A.S.]" After briefly speaking with Swing in MTPD's parking lot, A.H. and A.S. went back to A.S.'s car and drove to another nearby park where they discussed in more detail what happened during the ride along. According to A.S., she and A.H. were at the park for between 20 and 30 minutes. During this time, A.S. testified A.H. was distressed and was not acting like her normal self.

{¶ 18} At 6:10 p.m., while A.H. and A.S. were still in the parking lot speaking with Swing, A.H. sent a series of text messages to another friend, M.F.-G., wherein she asked M.F.-G. for advice on what to do since she had just been "sexually assaulted by an officer during a ride along[.]" Although never mentioning Swing by name, A.H. also texted M.F.-G. stating that "he was threatening me with like my career." These text messages were all sent within mere minutes of each other. According to A.H., she was "really upset" at the time these text messages were sent. A.H. further testified that although she was not crying at that time, "I was upset. I just didn't want to show it, because I didn't want people to know like what happened." Just as the trial court had done with the text messages A.H. sent to A.S., the trial court also admitted the text messages A.H. sent to M.F.-G. as excited utterances.

{¶ 19} After their conversation at the park concluded, A.S. then drove A.H. to A.H.'s parents' home. Once there, A.H. told her mother, G.H., what had happened during the ride along with Swing. According to G.H., her daughter was "very upset," "shaking," looked "very pale" like she was going to get sick or pass out, was "crying heavily," and was "very scared" when talking about the incident. Needing a place to talk away from A.H.'s father who they feared would be upset, A.H., A.S., and G.H. went to a local restaurant where they were seated at a private table in the back. After being seated, A.H., A.S., and G.H. discussed the day's events and their options going forward. As G.H. testified regarding their conversation at the restaurant, "[w]e just didn't know where to start. We knew we needed to do

something."  G.H. also testified that she was concerned for her family's safety since the allegations involved a police officer, "who was going to believe us and who wasn't."

{¶ 20} Upon returning home, A.H. sent Officer Rasfeld an e-mail telling him she would not be attending the out-of-town Explorer Program competition scheduled for that weekend. The record indicates A.H. looked forward to these competitions and was excited to attend the competition, but that she no longer wanted to attend because she was upset about what happened to her during the ride along with Swing.  The next day, Friday, April 17, 2015, A.H. told her father, D.H., what had happened during the ride along.  According to D.H., A.H. was upset and crying during this time.

{¶ 21} Although originally unsure if she wanted to file a complaint, A.H., with the advice of her parents, ultimately decided to set up a meeting with Officer Rasfeld to discuss what occurred during the ride along.  Due to competing schedules, this meeting took place at MTPD on Tuesday, April 21, 2015.  At this meeting, it is undisputed that A.H., who was accompanied by her parents, told Officer Rasfeld what happened during the ride along with Swing.  Upon learning of A.H.'s allegations, Officer Rasfeld informed another officer, Sergeant Jim Young, who then contacted the MTPD chief of police, Chief Sue Madsen. Chief Madsen then interviewed A.H. and explained how to file a formal complaint.  During this interview, Chief Madsen testified A.H. was "very scared, very upset," but still sympathetic to Swing.  Two days after meeting with Chief Madsen, A.H. filed her complaint and provided Chief Madsen with a written statement outlining her allegations against Swing.  The trial court subsequently admitted A.H.'s written statement into evidence as a non-hearsay prior consistent statement.

{¶ 22} Due to the seriousness of A.H.'s claims, both an administrative and criminal investigation were initiated against Swing by third-party, outside agencies.  Although not told specifically, Swing was informed by Chief Madsen that an investigation would be taking place

on Thursday, April 23, 2015, based on an allegation of misconduct. As part of the criminal investigation, a search warrant was obtained to search Swing's personal cell phone. The search of Swing's personal cell phone revealed a picture of A.H. taken on a "beer buy."[1] Swing did not have any pictures of anybody else who participated in the "beer buy." The search of Swing's personal cell phone also revealed that Swing had searched the Ohio Revised Code regarding the crimes of sexual battery, sexual imposition, and other general sex offenses on Saturday, April 25, 2015, two days before Chief Madsen informed Swing of the specific nature of the charges against him. An audio recording of Swing's meeting with Chief Madsen was played for the jury, wherein Swing can be heard saying he had no idea what charges had been levied against him prior to that meeting. A search of Swing's work cell phone also revealed that he had modified one of his contacts – a contact that bore A.H.'s first name – on the day of the ride along, Thursday, April 16, 2015.

{¶ 23} In addition to this evidence, the trial court introduced so-called "other acts" evidence from three women, M.S., B.R.H., and S.M. Prior to M.S. giving her testimony, the trial court instructed the jury as follows:

> Ladies and gentlemen, you're going to hear from [M.S], and you may hear from some others. You'll hear evidence about the commission of acts other than the offense with which Mr. Swing is charged with in this trial. You will receive it only for a limited purpose. You may not consider it to prove the character of Mr. Swing in order to show that he acted in conformity or in accordance with that character. If you find that the evidence of other acts is true and that Mr. Swing committed those acts, you may consider that evidence only for the purpose of deciding whether it proves Mr. Swing's motive, opportunity, intent, preparation, plan to commit the offense charged in this trial, knowledge, identity or absence of mistake or accident. This evidence cannot be considered for any other purpose.
>
> So I inform you of that now just so as you're listening to the witness and may – there may be other witnesses similarly

---

1. A "beer buy" was described as an attempt by MTPD to catch stores, gas stations, bars, and restaurants selling alcohol to underage individuals.

situated. So that's the instruction I'll give you.

The following is a summary of the testimony provided by M.S., B.R.H., and S.M.

*Testimony of M.S.*

{¶ 24} M.S., who was then 21 years old, testified that she first encountered Swing when she was 18 years old while working as a teller at Park National Bank in 2013. When asked about her interactions with Swing, M.S. testified that a lot of the things Swing said to her were sexual in nature. In describing these comments further, M.S. testified that there were "multiple times where he commented about my butt." M.S. also testified that Swing often spoke about touching and spanking her buttocks. M.S. then testified that Swing took pictures of her while she was working at Park National Bank without her knowing. However, because she was going to school for criminal justice, M.S. testified she and Swing "hit it off as far as talking about stuff like that." This eventually led to M.S. giving Swing her cell phone number so that he could assist her in obtaining an internship at MTPD, an internship she was awarded in early 2014.

{¶ 25} Prior to M.S. obtaining the internship with MTPD, M.S. testified that Swing would text her several times a week. According to M.S., these text messages included many references to her buttocks and "multiple comments about spanking." M.S. also testified that Swing would frequently stop by houses where she was housesitting. During one of these unexpected visits, M.S. testified as follows:

> The day that he came to pick up the letter of recommendation that I had written to the Miami Township chief he asked to come inside and see the house, and I thought that he genuinely wanted to see the house because there were nice houses that I stayed in. And right when he entered the front door he put his arms around me and had me – his arms right here, and he had me to where I couldn't move, and he, like, slowly walked me and pushed me up against the counter. And I turned my head to try and get him to get off of me, and when I turned my head his face was really close to mine, like, if I would have leaned in he would have kissed me.

M.S. then testified:

> And multiple times I asked him to please stop, and at that time I was uncomfortable. And there were multiple times where he made comments about wanting to see the upstairs and where the bedroom was, and I told him it was upstairs, and he said – there were multiple times where he said that let's just go upstairs no one will know. And there were times where I mentioned you're married, and I was – my boyfriend – I was with him then; he's now my husband. And there were multiple times where I said you're married and just stop. And he always referred to his wife as his roommate.

When asked why she never told anybody about this incident, M.S. testified she was trying to obtain a job with the Clermont County Sheriff's Office, that Swing was one of her references, and therefore, she "didn't want to do anything to jeopardize my opportunity that I have now."

{¶ 26} M.S. also testified about Swing's conduct during the two ride alongs she had with Swing while an intern with MTPD. Specifically, M.S. testified that Swing rubbed her arm when she would rest it on the center console, as well as "put his hand on my leg and rubbed my leg as well." M.S. further testified that Swing took her to his house while he was on duty when nobody else was home. Once there, M.S. testified she and Swing went inside where he offered her a bottle of water before going back outside to look at the creek in his backyard.

{¶ 27} In addition to going to Swing's house, M.S. also testified that Swing had taken her to the Kelly Nature Preserve, a park M.S. testified Swing referred to as "the pickle park." When asked why Swing referred to the Kelly Nature Preserve as "the pickle park," M.S. testified that the park was known to be a place where men would go to engage in homosexual activity. During one of these visits, M.S. testified Swing "made comments about let's go out into the woods," to which M.S. refused. Concluding, although M.S. testified she did not know A.H. personally, M.S. testified that she had heard Swing make a comment that A.H. was "an attractive girl."

*Testimony of B.R.H.*

{¶ 28} Similar to M.S., although several years earlier, B.R.H. first encountered Swing during her time working for Park National Bank in 2006. During this time, B.R.H. testified that Swing would "touch [her] hand while counting money back to him." According to B.R.H., this made her feel uncomfortable. Continuing, B.R.H. testified that although she had never given Swing her phone number, Swing nevertheless called her and "stated that his wife wasn't home, and he had asked me if I wanted to come over" to his house. B.R.H. testified that she declined Swing's invitation. B.R.H. also testified that on her birthday in either 2007 or 2008, Swing told her that he had a present for her, came around the counter, "put the handcuffs on my wrists behind my back, and he spanked my butt." When asked if she had ever been spanked for her birthday, B.R.H. testified that it may have happened when she was a child, but not since becoming an adult or at work.

{¶ 29} B.R.H. further testified about an incident that occurred in the parking lot of the Park National Bank in the summer of 2008 or 2009. As B.R.H. testified:

> I had – I had came back from lunch, and the way the parking lot
> was set up was customers also parked in the same parking lot.
> And he – when I was walking to branch (sic), he was sitting in his
> van. So he motioned me over, and I went over there, and he –
> when I came up to the car, he exposed himself and asked me to
> touch him, and he kind of grabbed my hand trying to pull it in.

B.R.H. testified that she told her manager about this incident, but that she did not call the police. When asked why the police were not called, B.R.H. testified that Swing "was a regular customer, I didn't want to start trouble, he was – he was a cop that, you know, we knew him as a cop."

*Testimony of S.M.*

{¶ 30} S.M., a police officer with MTPD, also testified about her encounters with Swing. S.M. testified she met Swing on her first day of work with MTPD approximately ten

years earlier. Shortly after being hired, S.M. testified that Swing put his hand on her leg during their dinner break at a local restaurant. S.M. did not tell anybody about this incident, however, since "I was two months on the department" and Swing was her supervisor.

{¶ 31} S.M. also testified about an incident where Swing reached his hand down into the back of her pants. In response, S.M. testified that she "reached back and pulled his hand away and shoved him away from me." S.M. further testified about an incident during roll call where Swing put his hand on her thigh. To this, S.M. testified she told Swing if he did not stop that she would tase him, "and then he acted like he was going to squeeze to tickle my leg, and I pulled my taser out and took the cartridge off and shocked him in the leg." When asked why she did not tell anybody about this incident, S.M. testified that she "felt like [she] had handled it appropriately." S.M. also testified that Swing told her several times that "he would spank me in the ass," and that Swing would take pictures and videos of her without her knowing.

### Swing's Defense

{¶ 32} In his defense, Swing called several witnesses who generally testified that they observed A.H. on the day in question and that she did not seem upset. Specifically, Sergeant Kevin Petrocelli testified that Swing and A.H. "seemed like they were fine" after the ride along concluded, "they're both teasing, joking around. My appearance that I saw her, it looks like she was smiling a little bit, or smiling." Officer Sherry Howard also testified that A.H. was "goofy" and a "little immature." Officer Howard further testified that some of the stories A.H. would tell "were out there," meaning her stories were exaggerated or embellished. Swing did not testify in his defense.

### Jury Instructions and Verdict

{¶ 33} After both parties rested, the trial court provided the jury with its final jury instructions. The jury instructions included the following in regards to the so-called "other

acts" evidence elicited from M.S., B.R.H., and S.M.:

> Evidence was received about the commission of acts other than the offenses with which the defendant is charged in this trial. That evidence was received only for a limited purpose. It was not received, and you may not consider it, to prove the character of the defendant in order to show that he acted in conformity with that character. If you find that the evidence of other acts is true and that the defendant committed them, you may consider that evidence only for the purpose of deciding whether it proves the defendant's motive, opportunity, intent, preparation, plan to commit the offense charged in this trial, knowledge, or absence of mistake or accident. That evidence cannot be considered for any other purpose.

{¶ 34} Following deliberations, and upon finding A.H.'s testimony credible, the jury returned a verdict finding Swing guilty of three third-degree misdemeanor counts of sexual imposition in violation of R.C. 2907.06(A)(1), a lesser included offense to gross sexual imposition. The trial court then sentenced Swing to three years of community control that included a 30-day jail sentence. Swing was also classified as a Tier I sex offender. Swing now appeals from his conviction, raising six assignments of error for review.

**Swing's First Assignment of Error**

{¶ 35} THE TRIAL COURT FAILED TO SUPPRESS THE UNLAWFUL SEARCH OF APPELLANT'S CELL PHONE.

{¶ 36} In his first assignment of error, Swing argues the trial court erred by denying his motion to suppress the search of his personal cell phone.

**Standard of Review: Motion to Suppress**

{¶ 37} Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact. *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769, ¶ 15, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. When considering a motion to suppress, the trial court, as the trier of fact, is in the best position to weigh the evidence in order to resolve factual questions and evaluate witness credibility. *State v.*

*Vaughn*, 12th Dist. Fayette No. CA2014-05-012, 2015-Ohio-828, ¶ 8. In turn, this court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Dugan*, 12th Dist. Butler No. CA2012-04-081, 2013-Ohio-447, ¶ 10. "'Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.'" *State v. Runyon*, 12th Dist. Clermont No. CA2010-05-032, 2011-Ohio-263, ¶ 12, quoting *Burnside*.

### Search Warrant Particularity

{¶ 38} Swing argues the evidence obtained from the search of his personal cell phone should have been suppressed because the warrant lacked sufficient particularity. Specifically, Swing takes exception to the warrant applying to "[a]ny and all information" related to the sexual imposition he committed against A.H. that may have been contained on his cell phone, including information from years prior. In other words, Swing argues the search warrant was not adequately limited to the relevant timeframe that the crime occurred, Thursday, April 16, 2015, nor in the subject matter to be seized. We disagree.

{¶ 39} The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution protect individuals against unreasonable governmental searches and seizures. As the Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

{¶ 40} The manifest purpose of the Fourth Amendment's particularity requirement is to prevent general searches. *State v. Widmer*, 12th Dist. Warren No. CA2011-03-027, 2012-Ohio-4342, ¶ 45, citing *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013 (1987). As a

result, "a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Massachusetts v. Sheppard*, 468 U.S. 981, 988, fn. 5, 104 S.Ct. 3424 (1984). In assessing whether a warrant meets the particularity requirement, courts must consider "whether the warrant provides sufficient information to 'guide and control' the judgment of the executing officer in what to seize," and "whether the category as specified is too broad in that it includes items that should not be seized." *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, ¶ 79. Simply stated, a search warrant will be held sufficiently particular when it enables a searcher to reasonably ascertain and identify the things that are authorized to be seized. *Widmer*, citing *State v. McCroy*, 6th Dist. Nos. WD-09-074 and WD-09-090, 2011-Ohio-546, ¶ 37; and *United States v. Blakeney*, 942 F.2d 1001, 1026 (6th Cir.1991).

**Analysis**

{¶ 41} As noted above, Swing first argues that the search warrant at issue lacked sufficient particularity since the warrant was not limited to the relevant timeframe the sexual imposition allegedly occurred, Thursday, April 16, 2015. However, "[t]he absence of a temporal limitation will not automatically render the warrant a prohibited general warrant." *McCroy*, 2011-Ohio-546 at ¶ 38. That is particularly true here given the fact that the warrant affidavit specifically states that Swing had taken pictures of the victim, A.H., with his personal cell phone "at various times" prior to that date. As a result, when considering the warrant affidavit also indicates A.H. had been part of the Explorer Program for approximately three years before the alleged sexual imposition took place, it is clear that relevant evidence prior to the day in question may have been contained on Swing's personal cell phone. Though a temporal limitation is one possible method of tailoring a search authorization, it is by no means a requirement. Therefore, after a thorough review of the record, we find the search warrant was sufficiently limited to pertain to the relevant timeframe at issue given the unique

facts and circumstances of this case; i.e., three years prior to when the alleged sexual imposition occurred.

{¶ 42} Of somewhat more concern is the issue of the subject matter to be seized. The First District Court of Appeals, however, recently addressed a substantially similar issue regarding a search warrant that authorized the search of the appellant's cell phone for "Electronic Serial Numbers, Mobile Identification Numbers, *any and all other data* that has been programmed into and/or received or recorded" by the device. (Emphasis added.) *State v. Pippin*, 1st Dist. Hamilton Nos. C-160380 and C-160381, 2017-Ohio-6970, ¶ 30-31. In finding the search warrant satisfied the particularity requirement, the First District determined that "[t]he language of the warrant provided sufficient guidance to the police to search for only the items to be seized: evidence relating to the crimes of rape and burglary." *Id.* That search warrant in *Pippin*, therefore, was conditioned upon, and limited to, the crime being investigated. The same is true here for the search warrant at issue was specifically limited to information relating to the allegations of sexual imposition committed by Swing against A.H., if any, regardless of the type of data on which that information was stored. This is because, as the trial court properly noted, the data on a cell phone can be easily manipulated.

{¶ 43} Swing relies heavily on a decision issued by the Federal District Court for the Southern District of Illinois in *United States v. Winn*, 79 F.Supp. 3d 904 (S.D.Ill.2015), to support his claim that the warrant in this case failed to satisfy the particularity requirements of the Fourth Amendment. In that case, the Illinois District Court determined that a search warrant authorizing the search of a cell phone for "any or all files" associated with the crime of public indecency did not meet the particularity requirement. However, unlike in this case, the warrant affidavit in *Winn* did not offer any basis – such as facts learned during the investigation or from the affiant's training and experience – to believe that such a search was necessary. On the other hand, in this case, the warrant affidavit explicitly stated how such

information, particularly that of stored communications, may become relevant to the crime charged in the case at bar. This includes the fact that, based on the affiant's training and experience, it was "common for people involved in the criminal activity to connect to the internet and research their illicit activities." The Illinois District Court's decision in *Winn* is therefore distinguishable from the case at bar.

**{¶ 44}** As the trial court stated, the search warrant in this case could not reasonably have described the items more precisely given the fact that "[t]he search was limited to the specified offense, to the specific victim (A.H.), and the warrant did not authorize intrusion into unrelated matters." We agree with the trial court's decision. "[I]t is only where such terms are not limited by time or subject matter that the warrant will be held invalid." *McCroy* at ¶ 41. Moreover, even if a search warrant includes broad categories of items to be seized, it "may nevertheless be valid when the description is 'as specific as the circumstances and the nature of the activity under investigation permit.'" *Castagnola*, 2015-Ohio-1565 at ¶ 80, quoting *Guest v. Leis*, 255 F.3d 325, 336 (6th Cir.2001). Such is certainly the case here given the nature of the crime involved in this case; namely, allegations of sexual imposition by Swing against A.H. *See, e.g., United States v. Neuhard*, 149 F.Supp.3d 817 (E.D.Mich.2016) (warrant that allowed search of electronic devices and cell phone for "[a]ny and all records or evidence" of child sexual abuse satisfied the particularity requirement of the Fourth Amendment "given the circumstances and nature of the activity being investigated"); *United States v. Harvey*, N.D.Ga No. 1:15-CR-53-TWT-RGV, 2015 U.S. Dist. LEXIS 174276 (Nov. 30, 2015) (search warrant for a cell phone was sufficiently particularized where the property to be seized was limited to evidence of the crimes being investigated); *United States v. Juarez*, E.D.N.Y. No. 12-CR-59, 2013 U.S. Dist. LEXIS 11869 (Jan. 29, 2013) (warrant satisfied the particularity requirement where the "warrant properly cabined the discretion of the officers by limiting the search to a specific phone for enumerated categories

of evidence related to a specific crime").

{¶ 45} "Unlike a physical object that can be immediately identified as responsive to the warrant or not, computer files may be manipulated to hide their true contents." *United States v. Mann*, 592 F.3d 779, 782 (7th Cir.2010). In turn, "there may be no practical substitute for actually looking in many (perhaps all) folders and sometimes at the documents contained within those folders, and that is true whether the search is of computer files or physical files. It is particularly true with image files." *United States v. Burgess*, 576 F.3d 1078, 1094-1095 (10th Cir.2009) (upholding a warrant to search "all computer records" for evidence of drug trafficking). The same applies to cell phones, devices that the United States Supreme Court has described as nothing more than "minicomputers that also happen to have the capacity to be used as a telephone." *Riley v. California*, ___U.S.___,134 S.Ct. 2473, 2489 (2014).

{¶ 46} As to the dissent, we agree that search warrants should not be overly generalized, particularly in regards to computers and cell phones. However, based on the facts of this case, we can find no error in the trial court's decision denying Swing's motion to suppress since the warrant met the particularity requirements of the Fourth Amendment. The search warrant affidavit, although requesting a search of "any and all information," was explicitly limited to the specific offense being investigated, allegations of sexual imposition, and to the specific victim involved, A.H. The same limitations were contained within the search warrant itself. Therefore, just as the trial court found, the search warrant in this case could not reasonably have described the items more precisely given the fact that "[t]he search was limited to the specified offense, to the specific victim (A.H.), and the warrant did not authorize intrusion into unrelated matters."

{¶ 47} As stated previously, in assessing whether a warrant meets the particularity requirement, courts must consider "whether the warrant provides sufficient information to 'guide and control' the judgment of the executing officer in what to seize," and "whether the

category as specified is too broad in that it includes items that should not be seized." *Castagnola*, 2015-Ohio-1565 at ¶ 79. Based on the nature of the activity under investigation, which, again, were allegations of sexual imposition by Swing against A.H., the search warrant in this case met both such requirements. Therefore, finding no error in the trial court's decision, Swing's first assignment of error is without merit and overruled.

## Swing's Second Assignment of Error

{¶ 48} THE TRIAL COURT FAILED TO DISMISS THE INDICTMENT AS A RESULT OF *GARRITY* VIOLATIONS.

{¶ 49} In his second assignment of error, Swing argues the trial court erred by denying his motion to dismiss the indictment due to an alleged *Garrity* violation.

## Standard of Review: *Garrity v. New Jersey*

{¶ 50} In *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616 (1967), police officers being investigated for criminal activity were given a choice to either answer the questions asked during the internal investigation or forfeit their jobs. The officers chose to answer the questions. Some of their answers were later used against those officers in criminal proceedings. The United States Supreme Court held that the officers' confessions were compelled and not voluntary because the officers were given the choice between forfeiting their jobs or incriminating themselves. *Id.* at 497-498. Specifically, the Supreme Court held that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." *Id.* at 500.

{¶ 51} Several years later, in *Kastigar v. United States*, 406 U.S. 441, 453, 92 S.Ct. 1653 (1972), the Supreme Court held that when a person is granted immunity to compel his or her testimony, prosecutorial authorities are prohibited from using the compelled testimony,

as well as evidence directly or indirectly derived from such testimony, in any respect against the witness in later criminal proceedings. *Id.* at 453. A grant of immunity thus insures that the testimony cannot lead to the infliction of criminal penalties on the witness. *Id.* As a result, the Supreme Court established a two-prong test the prosecution must satisfy when a witness claims his or her immunized testimony was used: (1) the government must deny any use of the witness' own immunized testimony against the witness in a criminal case; and (2) the government must affirmatively prove that all of the evidence it proposes to use is derived from legitimate sources wholly independent of the compelled testimony. *Id.* at 460-461. Once a defendant demonstrates he or she has testified, under a grant of immunity, to matters related to the criminal prosecution, the state has the heavy burden of showing that its evidence is not tainted by proving that the evidence it proposes to use was derived from legitimate independent sources. *Id.*

{¶ 52} In *State v. Conrad*, 50 Ohio St.3d 1 (1990), the Ohio Supreme Court adopted the two-prong test set forth in *Kastigar* and held that "whenever compelled testimony is used against the witness who provided it, any error cannot be held harmless." *Id.* at 4-5. More recently, in *State v. Jackson*, 125 Ohio St.3d 218, 2010-Ohio-621, the Ohio Supreme Court held that "the state makes derivative use of a *Garrity* statement both when the prosecutor presents to the grand jury testimony from a witness to a *Garrity* statement and when the prosecutor reviews a *Garrity* statement in preparation for trial." *Id.* at ¶ 25. The supreme court further held that "[w]hen the state fails to prove that it did not make any use of a *Garrity* statement in obtaining an indictment, the indictment must be dismissed." *Id.* at ¶ 29. By contrast, "when a trial court rules after a *Kastigar* hearing that a prosecutor has used the defendant's compelled statement in preparation for trial after indictment, the appropriate remedy is for the trial court to suppress that statement and all evidence derived from the statement." *Id.* at ¶ 32. "[T]he burden is on the state to establish that no use was made of

the immunized statement and that the evidence to be used at trial was derived from sources wholly independent of the immunized statement." *State v. Kirk*, 12th Dist. Clinton No. CA2009-09-015, 2010-Ohio-1287, ¶ 18.

## Analysis

{¶ 53} Swing argues the trial court erred by finding the state satisfied its burden establishing that (1) no use was made of the *Garrity* statements and (2) that all of the evidence to be used at trial was derived from legitimate sources wholly independent of any *Garrity* statements.[2] The trial court, however, clearly found credible the state's testimony, made under oath, that nobody prosecuting the case used the *Garrity* statements as part of trial preparation. As the assistant prosecutor even stated at the hearing on Swing's motion to dismiss, "I don't even remember what they said" and "didn't focus on it." The assistant prosecutor further testified that he was absolutely certain the *Garrity* statements had "no bearing" on his office's trial preparation. The trial court found this testimony, coming from an officer of the court while under oath, to be credible. The trial court, as the trier of fact, is in a much better position than this court to review a witness' credibility. While a statement may be useful, that does not mean that the statement was in fact used, either directly or derivatively.

{¶ 54} The trial court also found that the state met its burden establishing all evidence to be used at trial was derived from sources wholly independent of the *Garrity* statements. A review of the record supports the trial court's decision. This includes a fully detailed list submitted by the state that explicitly details where each witness and each piece of evidence was obtained by the state both before and after the indictment was issued. The trial court

---

2. The *Garrity* statements at issue are not direct statements from Swing purportedly made during the internal investigation of this incident by MTPD, but rather, a written summary that references his statements that later became public through a public records request, as well as testimony about Swing's statements made during his unemployment compensation hearing.

found this list, which was also testified to under oath, to be credible. There was also direct testimony from the assistant prosecutor that no witness or physical evidence was obtained from the *Garrity* statements. Therefore, based on the record properly before this court, we find no error in the trial court's decision to deny Swing's motion to dismiss. *See, e.g., State v. Bailey*, 12th Dist. Fayette No. CA2007-04-013, 2008-Ohio-3075, ¶ 46 (denying motion to dismiss indictment due to an alleged *Garrity* violation where the state presented an affidavit indicting it did not rely on the *Garrity* statement). Accordingly, Swing's second assignment of error is without merit and overruled.

**Standard of Review for Swing's Third, Fourth, and Fifth Assignments of Error**

{¶ 55} Swing's third, fourth, and fifth assignments of error all deal with the trial court's decision to admit certain evidence at trial. As this court has stated previously, a trial court has broad discretion in the admission and exclusion of evidence. *State v. Martin*, 12th Dist. Butler No. CA2007-01-022, 2007-Ohio-7073, ¶ 9. In turn, a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice. *State v. Smith*, 12th Dist. Fayette No. CA2007-10-35, 2008-Ohio-5931, ¶ 33. An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable, and not merely an error of law or judgment. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 129-130. "A review under the abuse-of-discretion standard is a deferential review." *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 14. We address each of Swing's next three assignments of error with these principles in mind.

**Swing's Third Assignment of Error**

{¶ 56} THE TRIAL COURT ABUSED ITS DISCRETION BY PERMITTING THE STATE TO INTRODUCE INADMISSIBLE HEARSAY EVIDENCE AS EXCITED UTTERANCES.

{¶ 57} In his third assignment of error, Swing argues the trial court abused its

discretion by admitting into evidence a series of text messages sent by A.H. to A.S. and M.F.-G. as excited utterances under Evid.R. 803(2). We disagree.

**Standard of Review: Excited Utterance Exception**

{¶ 58} In accordance with Evid.R. 801(C) and 802, hearsay, which is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," is generally inadmissible at trial. *State v. Sanchez-Garza*, 12th Dist. Butler No. CA2016-02-036, 2017-Ohio-1234, ¶ 34. However, Evid.R. 803(2) provides a hearsay exception for an "excited utterance." Pursuant to that rule, an "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." A hearsay statement is admissible as an excited utterance if: "(1) there was an event startling enough to produce a nervous excitement in the declarant; (2) the statement was made while under the stress of excitement caused by the event; (3) the statement related to the startling event; and (4) the declarant must have had an opportunity to personally observe the startling event." *State v. Worth*, 10th Dist. Franklin No. 10AP1125, 2012-Ohio-666, ¶ 22, citing *State v. Taylor*, 66 Ohio St.3d 295, 300-301 (1993). The controlling factor, therefore, is whether the declaration was made under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection. *State v. Knecht*, 12th Dist. Warren No. CA2015-04-037, 2015-Ohio-4316, ¶ 27.

**Analysis**

{¶ 59} As noted above, Swing argues the trial court abused its discretion by admitting into evidence the text messages sent by A.H. to A.S. and M.F.-G. as excited utterances under Evid.R. 803(2). According to Swing, the text messages should have been excluded since A.H. did not express any "nervous excitement" and did not appear visibly upset when observed by others that afternoon. However, while there was some testimony A.H. was not

visibly upset, this ignores A.H.'s own testimony wherein A.H. stated she was nervous, upset, and in a state of shock during the ride along with Swing. In fact, as A.H. specifically testified, she was scared and "just didn't know what was going on." This testimony was further corroborated by A.S., who testified A.H. was distressed and was not acting like her normal self shortly after the ride along concluded. This continued even after A.H. returned home where she was observed by her mother to be "very upset," shaking, and appeared "very pale." Therefore, because the record firmly establishes the text messages at issue fall squarely within the excited utterance exception to the hearsay rule as provide by Evid.R. 803(2), the trial court did not abuse its discretion by admitting these text messages into evidence as excited utterances. Accordingly, Swing's third assignment of error is without merit and overruled.

### Swing's Fourth Assignment of Error

{¶ 60} THE TRIAL COURT ABUSED ITS DISCRETION BY PERMITTING THE STATE TO INTRODUCE INADMISSIBLE HEARSAY EVIDENCE AS PRIOR CONSISTENT STATEMENTS.

{¶ 61} In his fourth assignment of error, Swing argues the trial court abused its discretion by admitting into evidence A.H.'s written statement as a nonhearsay prior consistent statement when the statement was, in fact, inadmissible hearsay. We disagree.

### Standard of Review: Non-Hearsay Prior Consistent Statement

{¶ 62} Pursuant to Evid.R. 801(D)(1)(b), an out-of-court statement is not considered hearsay if "[t]he declarant testifies at trial * * * and is subject to cross-examination concerning the statement, and the statement is * * * consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive." *State v. Brown*, 12th Dist. Butler No. CA2011-11-207, 2013-Ohio-1610, ¶ 16. Thus, the rule "permits the rehabilitation of a witness whose credibility has been

- 28 -

attacked by an express or implied charge that [the witness] recently fabricated [his or her] story or falsified [his or her] testimony in response to improper motivation or undue influence." *Id.*; *State v. Smith*, 12th Dist. Butler No. CA2009-02-038, 2010-Ohio-1721, ¶ 102.

**{¶ 63}** In order for the rule to apply, "the declarant must be subject to cross-examination and the statement must be offered to rebut an accusation that the declarant lied or was improperly influenced in [his or her] testimony." *State v. Williams*, 12th Dist. Butler No. CA2007-04-087, 2008-Ohio-3729, ¶ 12. As a result, to be admissible, the prior consistent statement must have been made before the existence of any motive or influence to falsify testimony. *State v. English*, 12th Dist. Butler No. CA2013-03-048, 2014-Ohio-441, ¶ 36. "In determining whether to admit a prior consistent statement for rebuttal purposes, a trial court should take a generous view of the entire trial setting to determine if there was sufficient impeachment of the witness to amount to a charge of fabrication or improper influence or motivation." *Smith* at ¶ 103, citing *State v. Grays*, 12th Dist. Madison No. CA2001-02-007, 2001 Ohio App. LEXIS 4798, *5 (Oct. 29, 2001).

**Analysis**

**{¶ 64}** Swing argues the trial court erred by admitting A.H.'s written statement as a non-hearsay prior consistent statement since he "never suggested that the story was recently fabricated" during his cross-examination of A.H.; but rather, focused on "her credibility with the suggestion that she was unreliable from day one." The trial court, however, in the consideration of the admission of A.H.'s written statement, observed that Swing was attacking A.H.'s motive by accusing him of spanking her buttocks while in the basement of his home, as well as touching her thigh and vagina while in his police cruiser. Swing argues, citing *State v. Williams*, 12th Dist. Butler No. CA2007-04-087, 2008-Ohio-3729, that A.H.'s written statement is inadmissible because there was no indication that A.H.'s improper motive to accuse Swing "occurred subsequent to the statement to Chief Madsen."

{¶ 65} Nevertheless, as noted above, we are guided by the principle that "[i]n determining whether to admit a prior consistent statement for rebuttal purposes, a trial court should take a generous view of the entire trial setting to determine if there was sufficient impeachment of the witness to amount to a charge of fabrication or improper influence or motivation." *Smith* at ¶ 103, citing *Grays*, 2001 Ohio App. LEXIS 4798 at *5. Therefore, although the trial court did not artfully articulate its reasoning for admission of the statement, based upon "a generous view of the entire trial setting," we simply do not find any abuse of discretion by admitting A.H.'s prior statement as a non-hearsay prior consistent statement. Such is certainly the case here, particularly when considering the fact A.H. was also cross-examined about her written statement, thereby rendering that statement merely cumulative. Accordingly, Swing's fourth assignment of error is without merit and overruled.

## Swing's Fifth Assignment of Error

{¶ 66} THE TRIAL COURT ABUSED ITS DISCRETION BY PERMITTING THE STATE TO INTRODUCE IMPERMISSIBLE CHARACTER EVIDENCE.

{¶ 67} In his fifth assignment of error, Swing argues the trial court abused its discretion by admitting impermissible character evidence prohibited by Evid.R. 404(B) and R.C. 2945.59, or, at the very least, Evid.R. 403. We disagree.

## Standard of Review: Evid.R. 404(B), R.C. 2945.59, and "Other Acts" Evidence

{¶ 68} Evidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime or that he acted in conformity with bad character. *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 40. In turn, pursuant to Evid.R. 404(B), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that a person acted in conformity therewith on a particular occasion. *State v. Hart*, 12th Dist. Warren No. CA2008-

06-079, 2009-Ohio-997, ¶ 11. Such evidence, however, is permitted for other purposes, including proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or the absence of mistake or accident. *State v. Thomas*, 12th Dist. Butler No. CA2012-11-223, 2013-Ohio-4327, ¶ 22.

{¶ 69} Similar to Evid.R. 404(B), the General Assembly has promulgated R.C. 2945.59, which provides:

> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

{¶ 70} Both the statute and the rule "codify the common law with respect to evidence of other acts of wrongdoing," and preclude admission of other acts evidence to prove a character trait in order to demonstrate conduct in conformity with that trait. *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 16; *State v. Vore*, 12th Dist. Warren No. CA2011-08-093, 2012-Ohio-2431, ¶ 39-40. However, neither the statute, nor the rule "requires that the other act be 'like' or 'similar' to the crime charged, as long as the prior act tends to show one of the enumerated factors." *State v. Wightman*, 12th Dist. Fayette No. CA2006-12-045, 2008-Ohio-95, ¶ 26, quoting *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, ¶ 19. Simply stated, "[t]o be admissible, the other-act evidence must tend to show by substantial proof one or more of the things that the rule or statute enumerates," such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 68 (12th Dist.).

{¶ 71} In *Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, the Ohio Supreme Court

outlined a three-part test for courts to use when determining the admissibility of so-called "other acts" evidence.  First, the court should "consider whether the other act evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence."  *Id.* at ¶ 20.  Next, the court should determine if "evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other act evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)."  *Id.*  Finally, the court should "consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice" as proscribed by Evid.R. 403.  *Id.*  As this court has stated previously, the test outlined in *Williams* "is the same essential test this court, as well as other courts throughout the state, have routinely applied in addressing challenges to the admissibility of 'other acts' evidence."  *State v. Ward*, 12th Dist. Clermont No. CA2013-07-059, 2014-Ohio-990, ¶ 17.

**Analysis**

{¶ 72} Swing challenges the testimony of the three "other acts" witnesses offered by the state; namely, M.S., B.R.H., and S.M.  After a thorough review of the record, however, we find no error in the trial court's decision to admit the disputed "other acts" evidence at trial.  Contrary to Swing's claim otherwise, the testimony elicited from M.S., B.R.H., and S.M. was highly probative of Swing's motive, intent, and plan, as well as the absence of mistake or accident.  Moreover, as this court has stated previously, "[o]ther-acts evidence need be proved only by substantial proof, not proof beyond a reasonable doubt."  *State v. Bromagen*, 12th Dist. Clermont No. CA2005-09-087, 2006-Ohio-4429, ¶ 14.  As a result, the testimony from M.S., B.R.H., and S.M., standing alone, was sufficient to constitute substantial proof of Swing's prior alleged misdeeds.  *Ward*, 2014-Ohio-990 at ¶ 31.

{¶ 73} Swing's claim that the evidence was unfairly prejudicial to him thereby violating

Evid.R. 403 is also lacking. The trial court minimized any potential prejudice by providing a limiting instruction to the jury both before M.S., B.R.H., and S.M. testified and again as part of its final jury instructions before submitting the case to the jury. "'A presumption exists that the jury has followed the instructions given to it by the trial court.'" *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, ¶ 194, quoting *State v. Murphy*, 65 Ohio St.3d 554, 584 (1992). While Swing suggests otherwise, this evidence goes well beyond merely establishing the fact that he was willing to make sexual passes at women. Rather, as noted above, this evidence – particularly that from M.S. – was highly probative of Swing's motive, intent, and plan, as well as the absence of mistake or accident. Therefore, finding no error in the trial court's decision to admit the disputed "other acts" evidence at trial, Swing's fifth assignment of error is overruled.

**Swing's Sixth Assignment of Error**

**{¶ 74}** THE TRIAL COURT FAILED TO ORDER A MISTRIAL DUE TO JUROR MISCONDUCT.

**{¶ 75}** In his sixth assignment of error, Swing argues the trial court erred by denying his motion for a mistrial based on alleged juror misconduct.

**Standard of Review: Mistrial for Juror Misconduct**

**{¶ 76}** "An inquiry into alleged juror misconduct requires a two-step analysis." *State v. Marshall*, 4th Dist. Lawrence No. 06CA23, 2007-Ohio-6298, ¶ 57. Specifically, in evaluating a claim of juror misconduct, it must be determined (1) whether there was juror misconduct, and (2) if so, whether the misconduct materially prejudiced the defendant's substantial rights. *State v. Steele*, 12th Dist. Butler No. CA2003-11-276, 2005-Ohio-943, ¶ 75, citing *State v. Taylor*, 73 Ohio App.3d 827, 833 (4th Dist.1991). Thus, even when juror misconduct has in fact occurred, a complaining party must still establish prejudice. *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, ¶ 42, citing *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940

(1982). A trial court must declare a mistrial only "when the ends of justice so require and a fair trial is no longer possible." *State v. Garner*, 74 Ohio St.3d 49, 59 (1995).

{¶ 77} Trial courts have broad discretion concerning matters of juror misconduct and potential bias. *State v. Williams*, 6th Dist. Lucas Nos. L-13-1053 and L-13-1054, 2014-Ohio-2834, ¶ 62. As a result, the granting or denial of a motion for mistrial based on alleged juror misconduct rests on the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Van Dyne*, 5th Dist. Guernsey No. 16CA10, 2017-Ohio-584, ¶ 23. An abuse of discretion is more than an error of law or judgment. *State v. Miller*, 12th Dist. Butler No. CA2016-01-007, 2016-Ohio-7360, ¶ 7. Rather, it suggests the "trial court's decision was unreasonable, arbitrary or unconscionable." *State v. Perkins*, 12th Dist. Clinton No. CA2005-01-002, 2005-Ohio-6557, ¶ 8. A decision is unreasonable when it is "unsupported by a sound reasoning process." *State v. Abdullah*, 10th Dist. Franklin No. 07AP-427, 2007-Ohio-7010, ¶ 16, citing *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990).

**Analysis**

{¶ 78} Swing argues the trial court erred by denying his motion for a mistrial because a juror, M.W., failed to disclose during voir dire that she had been sexually assaulted some 30 years prior but had not reported the crime to the police when asked if she "kn[e]w anyone who may have been a victim of a sex offense; never talked about it to police, never reported it, kind of kept it quiet." Swing claims this failure demonstrates clear bias on M.W.'s behalf that prejudiced him and ultimately denied him a fair trial, a claim Swing argues is further exacerbated by the fact M.W. "shared her personal experiences with the other jurors during deliberations." We disagree with Swing's claim.

{¶ 79} As noted by the Ohio Supreme Court, "[a] court may infer bias if it finds *deliberate* concealment; however, if the concealment was unintentional, the appellant must

- 34 -

show that the juror was actually biased." (Emphasis sic.) *State v. Williams*, 79 Ohio St.3d 1, 4 (1997), citing *Zerka v. Green*, 49 F.3d 1181, 1184-1186 (6th Cir.1995). In this case, however, after discussing the matter with M.W., the trial court found any failure by M.W. to disclose during voir dire that she had been sexually assaulted over three decades earlier was unintentional given the fact M.W. either did not hear the question or misinterpreted the question asked. As M.W. stated, "I thought it was criminal – I didn't hear the question." As the trial court stated when addressing M.W., "I think your intentions were way above board so don't second guess yourself on that." The trial court further found that, "[a]fter talking to [M.W.], I believe that [she] just didn't hear it." The trial court, having the opportunity to question M.W. personally and observe her demeanor, was in a much better position to weigh M.W.'s credibility than this court.

{¶ 80} Moreover, contrary to Swing's claim otherwise, M.W. did not share any details regarding the sexual assault with the other members of the jury aside from the fact that she had been sexually assaulted when she was very young and that she had only ever told her husband. As M.W. stated:

> It wasn't like shared. It was just like I was – I was making an example of something. And I was just saying you don't really know if you're in that position and I made it on both sides. It made it on defendants (sic) side and I made it on the prosecutor's side. I didn't just say that. And every one, you know, because I did ask afterward did I offend anyone. No, no, no, we would have known if we felt like you were taking sides.

Asked to explain further, M.W. stated:

> JUROR: At that time we are all making an opinion. And when it got to me I just said well, you can't really say that. Unless you're in that position, and then I just said – I didn't go into details. I said because I was assaulted and I do understand. I said that sometimes you might not make that quick decision right then. And then I elaborated on it.
>
> THE COURT: Tell us what you elaborated.

JUROR: I said as far as for the defendants (sic), I said I look at it from both sides I have a brother that is a police officer as well I said and things do happen. And that is all I said. I didn't go into details or anything.

THE COURT: No details.

JUROR: No I didn't go into details.

THE COURT: You told them you have a brother who is a police officer.

JUROR: I did. I did say that.

THE COURT: So I don't want to put words in your mouth but you mentioned that there is two sides and you mentioned to them that I was sexually abused so I understand that side.

JUROR: Right.

THE COURT: And my brother is a police officer and I know that side.

JUROR: That is basically what I was saying. I was just saying you have to look at it from two sides and I was just expressing you know that it is very hard because of that.

THE COURT: And I'm asking you never got into any details about your sexual abuse.

JUROR: No I didn't go into details. I just said I was assaulted – I think the question was who would you tell something like that and I was just saying I was assaulted and sometimes, you know, you can't tell anybody. I even expressed that I was from a little town called Mississippi and you don't talk about stuff like that so a lot of times you can't tell. That was the most part that I went into.

{¶ 81} Following this exchange, M.W. was removed from the jury panel and replaced with an alternate juror. The trial court then instructed the newly empaneled jury that it "must set aside and disregard all past deliberations and begin your deliberations all over again." The trial court further instructed the jury that it "should disregard any statements made during the deliberations about any personal experiences of the excluded jurors, and instead you

should decide this case based solely upon the evidence presented."[3]  Again, as this court

has stated previously, "a jury is presumed to follow instructions given by the trial court." *State

v. Carpenter*, 12th Dist. Butler No. CA2005-11-494, 2007-Ohio-5790, ¶ 20, citing *Pang v.

Minch*, 53 Ohio St.3d 186 (1990).

**{¶ 82}** After a thorough review of the record, find the trial court did not abuse its

discretion by denying Swing's motion for a mistrial.  We agree with the trial court's finding that

the record indicates M.W. did not deliberately conceal during voir dire the fact she did not

report to the police that she was sexually assaulted some 30 years prior when asked if she

"kn[e]w anyone who may have been a victim of a sex offense; never talked about it to police,

never reported it, kind of kept it quiet."  Instead, the record indicates M.W. simply did not hear

the question or, more likely, misinterpreted the question asked.

**{¶ 83}** Swing's concern is that a juror who had been sexually assaulted and did not

report it to police would offer a perspective during jury deliberations to explain why A.H. did

not report Swing's conduct when first given the chance, thus undermining an avenue of

attack upon A.H.'s credibility.  However, this is not a case where A.H. "never talked to the

police [about the sexual assault], never reported it, kind of kept it quiet" as set forth in the voir

dire question posed to the jury.  On the contrary, A.H. reported Swing's conduct to her friend

A.S. while the assault was still ongoing, to M.F.-G. mere minutes after her ride along with

Swing concluded, and to her mother, G.H., shortly after arriving at home that evening.  Within

days, A.H. also informed her father, D.H., as well as Officer Rasfeld and Chief Madsen.

Therefore, Swing's concerns that the jury may have somehow been tainted by M.W.'s

presence on the jury panel is simply not present in this case.  That is particularly true since

M.W. was removed from the jury and replaced with an alternate juror once the issue was

---

3. The trial court also removed P.E., the juror who informed the trial court of M.W.'s comments during deliberations, after P.E. became distraught, upset, and overly emotional.

discovered.

{¶ 84} Swing also failed to establish that M.W. exhibited any actual bias against him. In fact, as the trial court specifically stated, M.W.'s "intentions were way above board so don't second guess yourself on that." The trial court further found that "no substantial right of either the state or [Swing] has been affected adversely based upon the interview of [M.W.]." Therefore, based on the facts and circumstances of this case, including the fact that the trial court removed M.W. from the jury panel and replaced her with an alternate juror, Swing cannot establish that he was denied a fair trial. Accordingly, finding no error in the trial court's decision, Swing's sixth assignment of error is without merit and overruled.

{¶ 85} Judgment affirmed.

PIPER, J. concurs.

M. POWELL, J., concurs in part and dissents in part.

**M. POWELL, J., concurring in part and dissenting in part.**

{¶ 86} The search warrant issued in this case authorized the search of the entire contents of Swing's personal cell phone without probable cause for such a broad search, thus violating the Fourth Amendment's particularity requirement. I therefore dissent from the majority's affirmance of the trial court's denial of Swing's motion to suppress certain evidence seized from his personal cell phone.

{¶ 87} As noted, the Fourth Amendment provides that

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

{¶ 88} The Fourth Amendment requires search warrants (1) to be supported by

- 38 -

probable cause, and (2) to particularly describe the places and things to be searched and seized. The probable cause and particularity requirements are not independent of one another. Rather, probable cause and particularity are two sides of the same coin and analysis of one necessarily involves consideration of the other. As the Ohio Supreme Court observed, "'There is interplay between probable cause, particularity, and reasonableness.' Other courts have also found the issues to be inseparable. Therefore, the particularity issue is implicit in a probable-cause argument." (Citations omitted.) *State v. Castagnola*, 145 Ohio St. 3d 1, 2015-Ohio-1565, ¶ 70.

{¶ 89} There are two aspects of the particularity requirement. "The first issue is whether the warrant provides sufficient information to 'guide and control' the judgment of the executing officer in what to seize. The second issue is whether the category as specified is too broad in that it includes items that should not be seized." (Citations omitted.) *Id.* at ¶ 79.

{¶ 90} As to the first aspect, it has been explained that it involves "whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not, and * * * whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued." (Citations omitted.) *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir.1986).

{¶ 91} The second aspect involves "whether probable cause exists to seize all items of a particular type described in the warrant." *Id.* In other words, if probable cause does not support the seizure of a particular item, then the inclusion of that item in the search warrant violates the particularity requirement. It is upon this second aspect of the particularity requirement that the search warrant is lacking.

{¶ 92} The search warrant in this case authorized the executing officer to search for and seize from Swing's personal cell phone:

> 1) Any and all information pertaining to the listed mobile devices;

such as, A) All stored communications or files, including voice mail, email, digital images, contact lists, and any other files associated with the mobile device(s) which are no longer in transmission. B) Media stored in the mobile device(s) to include photos, videos which are no longer in transmission. C) Text Messaging, to include sent, received and drafts which are no longer in transmission. 2) Examination and search of the above mentioned mobile device(s) is for stored files, data, images, software, operating systems, deleted files, systems configurations, date and time, unallocated and slack space for evidence.

{¶ 93} Essentially, the search warrant authorized a search for everything stored upon Swing's personal cell phone. The probable cause section of the search warrant detailed the circumstances of the offense under investigation as follows:

On 4/27/15 P. O. Johnson was contacted by Miami Township Police Department to conduct an investigation involving Sgt. John Swing of said department and sexual misconduct allegations by a police explorer. I met with [A.H.] F 20, * * * who has been with the police explorer program for approximately 3 years. The interview took place on 4/28/15 and she gave the following statement. On 4/16/15 [A.H.] was scheduled for a ride along with a patrol officer. When she arrived Sgt. Swing told [A.H.] she was riding with him and not a patrol officer. [A.H.] stated the explorer policy was for them to ride with patrol and not a ranking officer. Sgt. Swing advised [A.H.] there were no other officers to place her with and she was riding with him. On or about 1300 hours Sgt. Swing look her to his residence * * * in Miami Township, Clermont County and while showing her wrestling moves had sexual contact with [A.H.] by spanking her butt. Once they were back inside the patrol car, while still on his tour of duty, Sgt. Swing reached over and placed his fingers on her vagina in a rubbing motion while asking if she was "nervous." Both incidents were done without the consent or the permission of the victim. During the interview the victim mentioned pictures that were taken of her at various times by Sgt. Swing prior to 4/16/15 using his cell phone. She described his cell phone as a black I phone.

{¶ 94} The only mention of Swing's personal cell phone in this factual recitation was the reference to Swing's use of the cell phone to photograph A.H at times prior to the offense. There was no indication that Swing had used his cell phone in connection with the offense itself or that evidence of the offense itself might be found stored on the cell phone

- 40 -

within this section of the affidavit.

{¶ 95} The affidavit continued by providing that

Based upon Affiant's training, experience and participation in previous mobile device investigations, The Affiant knows that:

1. It is common for people involved in the criminal activity to use mobile device(s) to communicate their illicit activities between each other.

2. It is common for people involved in the criminal activity to use mobile device(s) to take pictures and record videos of their illicit activities.

3. It is common for people involved in the criminal activity to connect to the internet and research their illicit activities.

4. It is common for people involved in the criminal activity to have stored in their phone, names and address of others involved in criminal activity to include known and unknown co-conspirators.

{¶ 96} Swing's prior use of his cell phone to photograph A.H. might indicate that Swing harbored some sexual attraction to A.H. Therefore, based on the nature of the offense, any photographs of A.H. contained on the cell phone would be relevant evidence of motive to commit the offense. In this regard, there was probable cause to search the cell phone for photographs of A.H. However, Swing's use of his cell phone to photograph A.H. does not establish probable cause to search files and data on the cell phone unlikely to contain such images or to seize items which obviously are not photographs of A.H.

{¶ 97} The affidavit's probable cause averments, based upon the affiant's training and experience as to how criminals use their cell phones, fail to bridge the gap between files and data which might contain images of A.H. and everything else contained on the cell phone. These averments were not in any way connected to Swing's alleged criminal misconduct. The factual recitation of the offense was that Swing acted alone, as opposed to in concert with others, and contained no hint that he recorded the alleged offense or conducted internet research relating to the offense. These averments were nothing more than generalities as to

how a cell phone may be employed by any criminal committing any offense and was pure conjecture as to how Swing may have used his cell phone in connection with this particular offense.

{¶ 98} As the search warrant authorized a search of the entire contents of the cell phone, it fails the particularity requirement of the Fourth Amendment because it is overbroad. "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013 (1987). "In obligating officers to describe the items to be seized with particularity, the Fourth Amendment prevents 'the issu[ance] of warrants on loose, vague or doubtful bases of fact.'" *United States v. Griffith*, D.C.Cir. No. 13-3061, 2017 U.S. App. LEXIS 15636, *22 (Aug. 18, 2017). "In that way, 'the requirement of particularity is closely tied to the requirement of probable cause.' When a warrant describes the objects of the search in unduly 'general terms,' it 'raises the possibility that there does not exist a showing of probable cause to justify a search for them.'" *Id.*, quoting 2 LaFave, *Search & Seizure* § 4.6(a) and (d).

{¶ 99} The Ohio Supreme Court considered a similar search warrant in *Castagnola*. In that case, the search warrant authorized the search of a computer for "records and documents." Like the search warrant here, the search warrant in *Castagnola* provided that the "records and documents" for which search and seizure were authorized, if found, would be used as evidence in the prosecution of certain specified crimes. The supreme court found that the search warrant violated the particularity requirement due to overbreadth because "the broad language of this search warrant clearly included items that were not subject to seizure. The search warrant permitted [police] to examine every record or document on Castagnola's computer in order to find any evidence of the alleged crimes." *Castagnola*,

- 42 -

2015-Ohio-1565 at ¶ 84. The specification of crimes to which the search for evidence would relate "added nothing to narrow the search." *Id.* at ¶ 82.

{¶ 100} In *United States v. Winn*, 79 F.Supp. 3d 904 (S.D.Ill.2015), the Federal District Court for the Southern District of Illinois considered a case similar in many respects to this one. Winn was observed at a public swimming pool using his cell phone to photograph or video record 13-and-14-year-old girls in their swimsuits without their permission. While doing so, Winn was rubbing his genitals on the exterior of his swimsuit. Winn was identified and pursuant to an investigation, voluntarily relinquished his cell phone to the investigating police detective. The police detective prepared a complaint for a search warrant to search the contents of Winn's cell phone.[4] The probable cause portion of the complaint detailed Winn's conduct as described above. The detective used a template supplied by the prosecutor to detail the information sought in the search as follows:

> any or all files contained on said cell phone and its SIM Card or SD Card to include but not limited to the calendar, phonebook, contacts, SMS messages, MMS messages, emails, pictures, videos, images, ringtones, audio files, all call logs, installed application data, GPS information, WIFI information, internet history and usage, any system files on phone, SIM Card, or SD Card, or any data contained in the cell phone, SIM Card or SD Card to include deleted space.

{¶ 101} A search warrant was issued authorizing a search of Winn's cell phone as sought in the detective's complaint. The search of Winn's cell phone revealed child pornography for which he was charged in federal court. Winn sought to suppress the evidence seized from his cell phone on the ground that the search warrant was overbroad and lacked particularity. The federal district court granted the motion to suppress, finding that

> The warrant in this case particularly described the place of the search: the white Samsung Galaxy III cell phone. With regard to

---

4. Apparently search warrants in Illinois are sought by complaint as opposed to affidavit.

the objects of the search, however, the warrant was facially overbroad, exceeded the probable cause to support it, and was not as particular as the circumstances would allow.

*Winn*, 79 F.Supp.3d at 919.

**{¶ 102}** In so holding, the federal district found there was no probable cause to search everything on the cell phone. Rather, the court determined that the search should have been restricted to only photos and videos:

> In sum, the complaint establishes that the police had probable cause to look for and seize a very small and specific subset of data on Winn's cell phone. But the warrant did not limit the scope of the seizure to only that data or describe that data with as much particularity as the circumstances allowed. Instead, the warrant contained an unabridged template that authorized the police to seize the entirety of the phone and rummage through every conceivable bit of data, regardless of whether it bore any relevance whatsoever to the criminal activity at issue.

*Id.* at 922.

**{¶ 103}** The majority distinguishes *Winn* on the ground that the complaint for the search warrant "did not offer any basis – such as facts learned during the investigation or from the [detective's] training and experience – to believe that such a [broad] search was necessary. On the other hand, in this case, the warrant affidavit explicitly stated how such information, particularly that of stored communications, may become relevant to the crime charged." Apparently, the majority refers to the affiant's averments as to how cell phones may be used in connection with criminal activity. However, as stated above, those averments are general and not in any way related to either Swing's use of his cell phone or an offense such as the one Swing was accused of committing. Furthermore, *Winn*'s reference to the lack of averments based on training and expertise recognized that, even if included, such averments must connect the object of the search to the criminal act under investigation:

> The bottom line is that if Detective Lambert wanted to seize every type of data from the cell phone, then it was incumbent upon him *to explain in the complaint how and why each type of*

- 44 -

*data was connected to Winn's criminal activity, and he did not do so.* Consequently, the warrant was overbroad, because it allowed the police to search for and seize broad swaths of data without probable cause to believe it constituted evidence of public indecency.

(Emphasis added.) *Winn*, 79 F.Supp.3d at 920.

{¶ 104} The search warrant affidavit suffers from the same deficiency identified in *Winn*. There was no averment in the affidavit explaining why information on Swing's cell phone beyond images of A.H. was connected to Swing's alleged criminal activity. Without such averments, the search of the entire contents of the cell phone, with law enforcement determining what things were evidence of sexual imposition, violates the particularity requirement. *See Castagnola*, 2015-Ohio-1565 at ¶ 82-83 (finding that the particularity requirement is violated by a search of broad categories of information with the determination of what to seize within the discretion of the person searching, based only upon the specification of the crimes under investigation).

{¶ 105} The affiant's averments based upon her training and experience as to how criminals may use their cell phones are generalizations, and standing alone, add nothing toward establishing probable cause to search for a particular thing in a given case. Some further averment connecting what is to be searched with the criminal activity under investigation is necessary.[5] A contrary holding reduces probable cause to an empty concept. Otherwise, every suspect with a cell phone is subject to having law enforcement rummage through his or her phone for evidence of the crime being investigated, merely by including such general averments in the search warrant affidavit. *Spilotro*, 800 F.2d at 963 ("[The particularity] requirement prevents general, exploratory searches and indiscriminate

---

5. This is not to say that general averments may never be considered for establishing probable cause. For instance, observing an individual engaged in a hand-to-hand transaction in area generally known as one where drug trafficking occurs adds context to the observed transaction. The general averments in this case, however, do not provide such context.

rummaging through a person's belongings").

{¶ 106} Despite a lack of probable cause to search for anything beyond images of A.H., Swing's internet search history was accessed, revealing that he had searched sections of the Ohio Revised Code relating to the offense of sexual imposition. In a case turning upon whether A.H. was believable, this was extremely prejudicial to Swing. That Swing conducted an internet search regarding the sexual imposition statutes before he was informed of the nature of the allegations against him, indicates his subjective awareness of what had occurred, thus enhancing the believability of A.H.'s claims. This, in my opinion, is reversible error.

{¶ 107} I concur with the majority in the resolution of Swing's second through sixth assignments of error. However, with regard and respect for my colleagues in the majority, I dissent from their resolution of Swing's first assignment of error. I find the first assignment of error well-taken and would reverse the trial court's denial of Swing's motion to suppress and remand for further proceedings.